Michael Zoldan; AZ Bar No. 028128
Jessica E. Miller; AZ Bar No. 031005
**CHELLE & ZOLDAN, PLC**
7400 East Pinnacle Peak Rd.
Suite 204
Scottsdale, AZ 85255
Tel & Fax: 480.442.3410
MZoldan@Chelle-Zoldan.com
JMiller@Chelle-Zoldan.com
Docketing@Chelle-Zoldan.com

Attorneys for Plaintiff
Michele Lake

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| **Michele Lake**, an Arizona resident, | Case No. |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT** |
| **imortgage.com, Inc.,** a Delaware Corporation; and **Loandepot.com, LLC,** a Delaware Corporation, | **(Jury Trial Requested)** |
| Defendants. | |

Plaintiff Michele Lake ("**Plaintiff**" or "**Lake**"), for her Verified Complaint against Defendants imortgage.com, Inc. ("**imortgage**") and Loandepot.com, LLC ("**Loan Depot**") (collectively referred to herein as "**Defendants**" or the "**Company**"), hereby alleges as follows:

## **PARTIES**

1.  Plaintiff is, and at all times relevant hereto was, a resident of Maricopa County, Arizona. At all times relevant to this lawsuit, Plaintiff was an "employee" of Defendants as defined in the Americans with Disabilities Act and the Americans with

Disabilities Act Amendments Act, 42 U.S.C.A. § 12101, *et seq.* (collectively referred to herein as the "**ADA**") and an "eligible employee" of Defendants as defined in the Family and Medical Leave Act, 29 U.S.C.A. § 2601, *et seq* ("**FMLA**").

2. Upon information and belief, imortgage is a Delaware corporation, which is registered to conduct business and is currently doing business in the State of Arizona. imortgage is, and at all times relevant hereto was, Plaintiff's "employer" as defined in the FMLA and as defined in the ADA.

3. Upon information and belief, Loan Depot is a Delaware corporation, which is registered to conduct business and is currently doing business in the State of Arizona. Loan Depot is, and at all times relevant hereto was, Plaintiff's "employer" as defined in the FMLA and as defined in the ADA.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 in that the claims set forth in this Complaint arise under federal law. All acts complained herein occurred in Maricopa County, Arizona, and this Court has jurisdiction over the parties and subject matter set forth in this Complaint pursuant to the ADA and the FMLA.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) in that the claims are so related to the claims in the action having original jurisdiction that it forms part of the same case or controversy.

6. The employment practices alleged to be unlawful were committed within, and had their primary effect in, the jurisdiction of the United States District Court for the District of Arizona.

7. Plaintiff was, at all relevant times, an employee of Defendants.

8. At all relevant times, Defendants have continuously been an employer engaged in an industry affecting commerce, employing fifty or more employees, within the meaning of the ADA and/or the FMLA.

9. Plaintiff has exhausted all administrative and statutory prerequisites necessary to commence this action, and therefore jurisdiction is proper.

10. Personal jurisdiction in this Court is proper.

11. Venue in this Court is proper.

## FACTUAL ALLEGATIONS

12. Lake commenced employment with Defendants on or about October 9, 2012 in an Underwriter II position.

13. Lake's job duties as an Underwriter II included examining loan applications prior to their approval.

14. For example, where there were discrepancies in the loan paperwork or other factors that indicated financial instability of the debtor, Lake's duty was to place a condition on approval of the loan in order to safeguard the loan's likelihood of repayment.

15. Throughout the first six months of her employment, Lake took advantage of every resource and additional training available to her in order to facilitate her ability to succeed in the Underwriter II position and was never warned or reprimanded about her productivity.

16. To the contrary, Lake performed her job duties at a satisfactory or above satisfactory level throughout this timeframe.

17. During a meeting with her team lead and immediate supervisor, Christy Clothier ("**Clothier**"), Lake was promised that the Company would assist her with necessary training in order to learn the imortgage method of underwriting loans.

18. Unfortunately, Lake soon learned that the imortgage method of underwriting loans consisted of what she believed to be fraudulently authorizing loans with clear indicators that the debtor was experiencing financial hardship or else had misrepresented facts on his or her application.

19. On several occasions, Lake voiced her concerns regarding potentially fraudulent loans, some of which were insured by the Department of Housing and Urban Development ("**HUD**"), an agency of the federal government.

20. Many of the loans that Lake was responsible for underwriting were insured by HUD, which issues guidelines that both loan underwriters and loan companies must abide by.

21. In addition to federal guidelines and restrictions, the State of Arizona also regulates loan underwriters and loan companies.

22. The Arizona Department of Financial Institutions likewise regulates mortgage bankers and imposes regulations governing loan approval.

23. On each occasion that Lake came across what she perceived to be a potentially fraudulent or otherwise unlawful loan, despite her concerns, she was nonetheless encouraged by the Company to underwrite the loans.

24. In particular, one of these occasions occurred in late April of 2013, when Lake alleged that underwriting a loan would be unlawful because the applicant first verified that her IRS obligations were fulfilled, but later that same day stopped payment

on the check used to verify payment of that obligation.

25. Like in the past, she voiced these concerns to the Company and was nonetheless encouraged to approve the loan without placing conditions on it.

26. Approximately two weeks later, on or about May 16, 2013, the Company scheduled a one-on-one meeting with Lake and Clothier. Clothier informed Lake that she digs too deep into the applications and needed to prioritize pushing the loans through over being thorough. Clothier insisted that the meeting was non-disciplinary in nature.

27. During this same meeting, Lake discussed her continuing need for training, particularly in light of her disability.

28. Lake is diagnosed with Attention Deficit Disorder ("**ADD**").

29. ADD is a neurobiologically-based developmental disability characterized by difficulty concentrating and regaining focus if interrupted mid-task.

30. Since her diagnosis, Lake has regularly seen a physician, who treats her condition.

31. This disability impairs Lake's mental processing speed, which severely and substantially limits her ability to perform several major life activities including, but not limited to working, learning, multi-tasking, concentrating, thinking, and communicating.

32. Despite her disability, Lake is qualified to perform the essential functions of her job position, with or without the requested accommodations, and demonstrated that ability to Defendants.

33. Approximately two weeks after the informal one-to-one on May 16, 2013, Clothier issued a disciplinary Corrective Action Notice ("**CAN**"), stating again that Lake "digs too deep," specifically referring to Lake's reluctance and outright refusal to

approve fraudulent loans. The CAN raised productivity issues for the first time in the approximately seven months Lake had been employed with imortgage.

34. When delivering the CAN, Clothier informed Lake that she didn't agree with its contents and did not think that the reprimand was necessary.

35. The CAN was meant to discourage Lake's diligent investigation and most importantly—her complaints about potentially fraudulent loans.

36. On or about June 12, 2013, Lake renewed her accommodation request in writing, again informing imortgage of her disability and expressing the need for an accommodation.

37. In order to discuss Lake's specific accommodation requests, she participated in an informal meeting with Vice President of Underwriting, Rick Bargioni ("**Bargioni**") and HR Coordinator, Leann Tournas ("**Tournas**").

38. During this meeting, Lake specifically requested: (1) lateral transfer to a vacant position on another underwriting team under a different supervisor who was more adept to manage a new underwriter; (2) additional resources and training; and (3) additional time to complete non-essential tasks.

39. Each of the requested accommodations were not only reasonable under the circumstances, but were calculated to effectively ameliorate the limitations imposed by Lake's disability.

40. In addition, the proposed accommodations would impose no costs whatsoever to imortgage.

41. Nonetheless, Defendants did not grant the requested accommodation during this meeting and demanded additional documentation from Lake.

42. Following this meeting, Lake was disciplined once again through another CAN on June 21, 2013.

43. This second CAN likewise focused on Lake's alleged deficiencies in productivity, despite acknowledging that her productivity had actually increased since her first CAN.

44. Contemporaneously with the second CAN, the Company acknowledged that it received positive feedback regarding training time Lake spent with a Company underwriting trainer, which supports the reasonableness and effectiveness of Lake's accommodation request for additional training.

45. The second CAN nonetheless claimed that the problems articulated in the first CAN persisted.

46. On or about July 10, 2013, Lake provided Defendants with a letter from her physician confirming that she suffers from ADD and that Lake's ADD constitutes a disability. This letter complied with Defendants' request for further medical information regarding Lake's disability.

47. After Defendants failed to respond to Lake's medical documentation or otherwise engage in the interactive process with her, Lake reached out to both Bargioni and Tournas to inquire as to the status of her request on or about July 24, 2013.

48. Her inquiry was ignored.

49. Once again, after no response from the Company, on July 29, 2013, Lake asked Clothier about the status of her accommodation request.

50. Clothier insisted that she did not have sufficient information regarding Lake's request and deferred to Bargioni and Tournas, who both continued to ignore

Lake's persistent requests.

51.     Eventually, on July 31, 2013, the Company informed Lake that it would not grant her requests: it could not provide her with additional time to complete tasks, could not provide additional training, and would not transfer her into the vacant underwriter position.

52.     The Company did, however, under the guise of offering an alternative accommodation option, promise to transfer her into a newly-generated job position, which purportedly required the performance of underwriting tasks monitoring post-closing deficiencies.

53.     The Company stated that Lake would work on "special projects" requiring underwriting skills, and the terms and conditions of her employment would remain unaltered.

54.     However, in or around August 2013, when Lake began this "new position," it was clear that imortgage had grossly misrepresented the character of the new position and it was effectually a demotion.

55.     Lake's new position was a Processor Training Lead, requiring a completely different skill set that was in no way related to underwriting.

56.     In addition, the Company placed her in this role with no training, knowing that Lake could not succeed in an entirely new position without training.

57.     The Company placed Lake in this position to either set her up for failure, which would merit termination, or else to frustrate Lake to the point that she would resign.

58.     To the contrary, in order to acclimate to her new position, Lake requested

training, asked for training manuals or instructive materials, and otherwise requested assistance from both her supervisor and her peers.

59. Each of these further accommodation requests for training in this position was ignored.

60. Based on the foregoing, Lake filed Charge of Discrimination No. 540-2013-02955 with the EEOC.

61. Following the submission of her Charge, the Company took further retaliatory action against her, refusing to transfer her into other positions that she applied for within the Company that were better suited for her skill sets as an underwriter.

62. Although Lake was qualified for each of these positions, the Company instead hired less-qualified, non-disabled individuals.

63. Approximately two months into the Processor Training Lead position, Lake was in a car accident and required FMLA leave beginning on November 1, 2013.

64. Lake suffered various injuries to her head and back in the car accident.

65. These injuries amounted to a serious health condition, necessitating FMLA leave.

66. Lake returned to work on or about February 18, 2014.

67. Following her period of leave, Lake returned to an increasingly antagonistic atmosphere.

68. She was not restored to her original position or to a position equivalent in job conditions upon her return.

69. The first day she returned to work, her desk had been cleared and all materials that she had compiled in attempts to train herself had been removed from her

desk.

70. She was also informed that she must alter her work schedule, which would require her to either start her work day earlier or leave later. The alteration was not applied by the Company to Lake or her peers until she returned from leave.

71. In addition, the newly required change in Lake's schedule was contrary to the Company's promises before her transfer that the terms and conditions of her employment would remain the same as her Underwriter II position.

72. The schedule change did not alter the amount of hours Lake worked per day and Lake's existing schedule did not interfere with or otherwise rely on any other employees' schedules. The Company offered no articulable basis, much less a legitimate business reason, to impose the requirement.

73. The Company imposed the change with the knowledge that Lake would be unable to alter her schedule because she had to arrive and leave work at specific times in order to provide transportation to and from daycare for her special needs son.

74. Lake reminded the Company that it had repeatedly assured her that she could maintain her Underwriter II schedule.

75. In response, the Company demanded that she alter her schedule or else she would be terminated.

76. One week after returning from FMLA leave, Lake was terminated, ostensibly for being unable to modify her work schedule.

77. The termination was actually in retaliation for taking FMLA leave.

78. Based on the foregoing, Lake filed another Charge of Discrimination No. 540-2014-01595 with the EEOC.

79. Lake has been unable to procure comparable employment since her termination.

# COUNT I
# DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT

80. Plaintiff reasserts and realleges each and every allegation in this complaint as if fully set forth herein.

81. The ADA prohibits discrimination against a qualified individual with a disability in regard to terms, conditions and privileges of employment.  42 U.S.C. § 12112(a).

82. Plaintiff has a physical impairment that substantially limits a major life activity.

83. In the alternative, the length of time during which Plaintiff has experienced symptoms, and for which she will continue to suffer from, constitutes a record of impairment.

84. Plaintiff suffers from ADD which is a disability as defined by the ADA.

85. Defendants are employers under the ADA.

86. Defendants knew of Plaintiff's physical limitations.

87. Defendants treated Plaintiff disparately as compared to other similar situated non-disabled employees because of her disability.

88. Plaintiff is qualified to perform the essential functions of her position.

89. Plaintiff requested reasonable accommodations to allow her to perform the non-essential functions of her position.

90. Defendants discriminated and retaliated against Plaintiff by failing to provide her with reasonable accommodations and terminated her due to her disabilities

and EEOC complaint. See 42 U.S.C. § 12112(b).

91. Accommodating Plaintiff's reasonable requests would not inflict undue hardship on Defendants.

92. Plaintiff's requested accommodations would be effective.

93. Plaintiff's disability was at the very least a motivating factor in Defendants' discriminatory conduct.

94. As a direct, intentional, and willful consequence of such illegal conduct, Plaintiff suffered adverse employment actions including, *inter alia*, termination of employment.

95. As a result, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT II
## RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

96. Plaintiff reasserts and realleges each and every allegation in this complaint as if fully set forth herein.

97. The ADA prohibits discrimination against any individual because such individual engaged in protected activity under the ADA. See 42 U.S.C. § 12203(a).

98. Plaintiff engaged in protected activity by requesting reasonable accommodations and filing a Charge of Discrimination with the EEOC.

99. Defendants retaliated against Plaintiff by failing to provide her with reasonable accommodations, demoting her, and terminating her employment.

100. Plaintiff's disability was at the very least a motivating factor in Defendant's retaliatory conduct.

101. As a direct, intentional, and willful consequence of such illegal conduct,

Plaintiff suffered adverse employment actions including, *inter alia*, job relocation and termination of employment.

102. As a result, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT III
## INTERFERENCE UNDER THE FAMILY AND MEDICAL LEAVE ACT

103. Plaintiff reasserts and realleges each and every allegation in this complaint as if fully set forth herein.

104. It is unlawful for an employer to interfere with, restrain, or deny the exercise of any right under the FMLA. 29 U.S.C. § 2615.

105. Defendants employ more than 50 employees and as such, are employers for purposes of FMLA, subject to FMLA requirements.

106. Plaintiff was an "eligible employee" entitled to take leave pursuant to the FMLA.

107. Plaintiff had a "serious health condition" as defined by the FMLA and was incapacitated as a result of that condition.

108. Plaintiff provided sufficient notice of her need to take leave under the FMLA.

109. Plaintiff exercised her rights under the FMLA.

110. Upon her return from leave, Plaintiff was not restored to her original position or to a position equivalent in job conditions.

111. Defendants' adverse employment action discouraged Plaintiff and other employees from exercising rights under the FMLA.

112. Defendants terminated Plaintiff as a result of her requests and necessity for FMLA leave.

113. Plaintiff's FMLA leave was at the very least a motivating factor in her termination.

114. As a direct, intentional, and willful consequence of such illegal conduct, Plaintiff suffered adverse employment actions including, inter alia, termination of employment.

115. Plaintiff is entitled to recover damages against Defendants in an amount to be proven at trial.

## COUNT IV
## RETALIATION UNDER THE FAMILY AND MEDICAL LEAVE ACT

116. Plaintiff reasserts and realleges each and every allegation in this complaint as if fully set forth herein.

117. It is unlawful for an employer to interfere with, restrain, or deny the exercise of any right under the FMLA. 29 U.S.C. § 2615.

118. Defendants employ more than 50 employees and as such, are employers for purposes of FMLA, subject to FMLA requirements.

119. Plaintiff was an "eligible employee" entitled to take leave pursuant to the FMLA.

120. Plaintiff has a "serious health condition" as defined by the FMLA and was incapacitated as a result of that condition.

121. Plaintiff provided sufficient notice of her need to take leave under the FMLA.

122. Plaintiff engaged in protected activity when she exercised her rights under the FMLA.

123. Defendants terminated Plaintiff in retaliation against her requests and

necessity for FMLA leave.

124. Plaintiff's FMLA leave was at the very least a motivating factor in her termination.

125. As a direct, intentional, and willful consequence of such illegal conduct, Plaintiff suffered adverse employment actions including, inter alia, termination of employment.

126. Plaintiff is entitled to recover damages against Defendants in an amount to be proven at trial.

## COUNT V
## RETALIATION IN VIOLATION OF ARIZONA REVISED STATUTES § 23-1501

127. Plaintiff reasserts and realleges each and every allegation in this complaint as if fully set forth herein.

128. Plaintiff is an "employee" for the purposes of the Arizona Employment Protection Act.

129. Defendants are "employers" for the purposes of the Arizona Employment Protection Act.

130. Plaintiff disclosed to her supervisor that she believed that the employer, or an employee of the employer, was violating the Constitution of Arizona or the statutes of this state.

131. Plaintiff's disclosure was reasonable.

132. Defendants terminated Plaintiff in retaliation for this disclosure.

133. Plaintiff's termination is against the public policy of this state.

134. Plaintiff is entitled to recover damages against Defendants in an amount to be proven at trial.

## CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants, as follows:

A. An award of damages for all counts in an amount to be proven at trial;

B. An award of compensatory and punitive damages in an amount to be proven at trial;

C. An award of back pay and front pay;

D. Liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii); and

E. Pre- and post-judgment interest;

F. Reasonable attorneys' fees and other expenses under the FMLA and ADA pursuant to 29 U.S.C.A. § 2617(3) and 42 U.S.C. § 12117 (deferring to Title VII remedial structure allowing award of attorney's fees (*see* 42 U.S.C. § 2000e-5(k)).

G. Any other remedies or judgments deemed just and equitable by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

RESPECTUFLLY SUBMITTED June 12, 2014.

**CHELLE & ZOLDAN, PLC**

By: /s/ Michael Zoldan
7400 E. Pinnacle Peak Rd. Ste. 204
Scottsdale, AZ 85255
Attorneys for Plaintiff Michele Lake

## VERIFICATION

Plaintiff Michele Lake declares under penalty of perjury that she has read the foregoing Verified Complaint and is familiar with the contents thereof. The matters asserted therein are true and based on her personal knowledge, except as to those matters stated upon information and belief, and as to those matters, she believes them to be true.

*/s/ Michele L. Lake*
Michele Lake